## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHEVRON ORONITE COMPANY,**                      **CIVIL ACTION**
**LLC,**
       **Plaintiff**

**VERSUS**                                         **NO. 16-10594**

**THE CAJUN COMPANY,**                        **SECTION: "E" (5)**
       **Defendant**

### ORDER AND REASONS

Before the Court are cross-motions for summary judgment filed by the Plaintiff, Chevron Oronite Company, LLC (referred to as "Oronite" or "Chevron")[1] and the Defendant, Cajun Company ("Cajun").[2] The motions are opposed.[3]

### BACKGROUND

This matter arises out of two contracts between Oronite and Cajun for Cajun to perform work at the Oronite facility in Belle Chasse, Louisiana. On October 2, 1978, Oronite entered into Contract No. C-1540 with Cajun.[4] On December 14, 1978, Oronite entered into a second contract—Contract No. C-1554—with Cajun.[5] Both contracts contain indemnification provisions and require Cajun to name Oronite as an additional insured on Cajun's insurance policies.[6]

Randy Dufrene, a Cajun employee from 1977 until 1983, performed work at Oronite under Contract Nos. C-1540 and C-1554. On October 10, 2014, Mr. Dufrene sued Oronite for damages he allegedly sustained as a result to his exposure to asbestos while

---

[1] R. Doc. 13.
[2] R. Doc. 49.
[3] R. Docs. 55, 57.
[4] R. Doc. 13-8.
[5] R. Doc. 13-9.
[6] R. Docs. 49-4 at 5; 49-7 at 6.

working at the Oronite facility.[7] Oronite sent a letter to Cajun demanding that Cajun defend and indemnify Oronite pursuant to Contract Nos. C-1540 and C-1554 against Mr. Dufrene's claims.[8] Oronite also requested coverage as an additional insured under Cajun's comprehensive general bodily injury liability insurance policies.[9] Cajun denied Oronite's demand for defense and indemnity,[10] which prompted Oronite to file the instant lawsuit.[11]

Oronite seeks damages against Cajun for breach of contract for failing to name Oronite as an additional insured on its insurance policies, as required by Contract Nos. C-1540 and C-1554. Oronite also seeks indemnity from Cajun for the amount of Oronite's settlement with Mr. Dufrene, for its attorneys' fees and costs incurred in defending the lawsuit brought by Mr. Dufrene, and for its attorneys' fees and costs incurred in bringing this action.

Both Oronite and Cajun have filed motions for summary judgment.[12] Oronite contends there exist no genuine disputes of material fact, and it is entitled to judgment as a matter of law that (1) Cajun's failure to name Oronite as an additional insured is a breach of Cajun's contracts with Oronite; (2) Oronite is entitled to indemnity from Cajun for the amount of its settlement with Mr. Dufrene; and (3) Oronite is entitled to attorney's fees and costs incurred in connection with the defense of Mr. Dufrene's claim, as well as Oronite's attorney's fees and costs in this action.[13]

---

[7] R. Doc. 13-2 at 4; R. Doc. 57-7 at 2; R. Doc. 13-10.
[8] R. Doc. 13-16.
[9] *Id.*
[10] R. Doc. 13-17. Cajun did not respond at that time to Oronite's request for coverage as an additional insured.
[11] R. Docs. 1, 4.
[12] R. Docs. 13, 49.
[13] R. Doc. 13.

Cajun contends there exist no genuine disputes of material fact, and it is entitled to judgment as a matter of law that (1) Oronite's breach of contract claim has prescribed; (2) Oronite is not entitled to indemnity under Contract No. C-1540 because Mr. Dufrene's exposure to asbestos did not occur while he was working under Contract No. C-1540; and (3) Oronite is not entitled to indemnity under Contract No. C-1554 because Mr. Dufrene's claims arose out of Oronite's negligence, and the indemnity provision of Contract No. C-1554 does not entitle Oronite to indemnity for its own negligence.[14]

## STANDARD OF LAW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15] "An issue is material if its resolution could affect the outcome of the action."[16] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[17] All reasonable inferences are drawn in favor of the nonmoving party.[18] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[19]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would

---

[14] R. Doc. 49.
[15] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[16] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[17] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[18] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[19] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).

'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[20] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the nonmoving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[21]

If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) affirmatively demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[22] When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law.[23] When, however, the movant is proceeding under the second option and is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[24] Under either scenario, the burden then shifts back to the movant to

---

[20] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).

[21] *Celotex*, 477 U.S. at 322–24 (Brennan, J., dissenting).

[22] *Id.* at 331–32.

[23] *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

[24] *Celotex*, 477 U.S. at 332–33.

demonstrate the inadequacy of the evidence relied upon by the nonmovant.[25] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[26] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[27]

"[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[28]

## LAW AND ANALYSIS

I.    <u>**Oronite's Breach of Contract Claim has Prescribed**</u>

Oronite asserts a breach of contract claim against Cajun for allegedly failing to name it as an additional insured on Cajun's liability policies, as required by Contract Nos.

---

[25] *Id.*

[26] *Celotex*, 477 U.S. at 332–33, 333 n.3.

[27] *Id.*; *see also First National Bank of Arizona*, 391 U.S. at 289.

[28] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

C-1540 and C-1554.[29] Cajun seeks summary judgment dismissing Oronite's breach of contract claim, arguing it has prescribed.[30]

It is undisputed that Oronite entered into Contract No. C-1540 with Cajun on October 2, 1978,[31] and entered into Contract No. C-1554 with Cajun on December 14, 1978.[32] Both contracts required Cajun to name Oronite as an additional insured. Contract No. C-1540 provides:

> 6.2 The insurance specified in [Section 6.13] of these Terms and Conditions shall:
> (a) name the indemnitees as additional insureds;
> (b) provide that said insurance is primary coverage with respect to all insureds; and
> (c) contain a Standard Cross Liability Endorsement or Severability of Interest Clause.
>
> 6.3 Evidence of Insurance: [Cajun] shall—before commencing the work—provide [Oronite] with certificates or other documentary evidence of the above insurance, satisfactory to [Oronite].[33]

Similarly, Contract No. C-1544 provides:

> 4.2 Evidence of Insurance: [Cajun] shall—before commencing the work—provide [Oronite] with certificates or other documentary evidence of the above insurance, satisfactory to [Oronite].
>
> 4.4 The insurance specified in [Section 4.13] of these Terms and Conditions shall:
>
> (a) name the indemnitees as additional insureds;
> (b) provide that said insurance is primary coverage with respect to all insureds; and
> (c) contain a Standard Cross Liability Endorsement or Severability of Interest Clause.[34]

---

[29] R. Doc. 1.
[30] R. Doc. 49.
[31] R. Doc. 49-3 at 1, R. Doc. 55-1 at 1, R. Doc. 49-4.
[32] R. Doc. 49-3 at 1, R. Doc. 55-1 at 1, R. Doc. 49-7.
[33] R. Doc. 49-4 at 4–5.
[34] R. Doc. 49-7 at 6.

Oronite seeks summary judgment that Cajun breached both contracts by failing to have Oronite named as an additional insured under Cajun's insurance policies.[35] Cajun opposes the motion, and attempts to create a genuine dispute of material fact with respect to whether Oronite was named as an additional insured, by pointing to the certificate of insurance provided to Oronite[36] and to the testimony of its president, Mr. Duhe.[37] When asked whether Cajun complied with Contract Nos. C-1540 and C-1554 by naming Oronite as an additional insured under the applicable insurance policies, Mr. Duhe testified "We've met Chevron's requirement . . . and if [naming Oronite as an additional insured] was part of their requirements, we met it and they checked it out. They wouldn't let you work there unless you have the insurance straight."[38] Because of the Court's ruling, as set forth below, that Oronite's breach of contract claim has prescribed, the factual dispute as to whether or not Cajun breached the contracts between it and Oronite by failing to name Oronite as an additional insured is not material.

The parties do not dispute the terms of the contracts between Oronite and Cajun or when Mr. Dufrene filed his lawsuit. Nor do the parties dispute that the ten-year prescriptive period applies to Oronite's breach of contract claim. The parties disagree only about when the prescriptive period on Oronite's breach of contract claim began to accrue.[39] On the one hand, Cajun argues the prescriptive period began to run when the contracts were executed.[40] Oronite, on the other hand, argues the prescriptive period began at the time Oronite was sued by Mr. Dufrene, because "[d]amages are an essential

---

[35] R. Doc. 13-1 at 13.
[36] R. Doc. 49-10 at 30–33.
[37] R. Doc. 55-3 at 4.
[38] R. Doc. 55-3 at 4.
[39] *See* R. Doc. 49-1 at 8–11; R. Doc. 55 at 6–8.
[40] R. Doc. 49-1 at 8–11.

element to a breach of contract claim" and "Oronite did not incur damages until [it] was unable to obtain additional insured insurance coverage after Oronite was sued by Mr. Dufrene in October 2014."[41] Alternatively, Oronite argues the doctrine of *contra non valentum* applies to its breach of contract claim because "Oronite did not have knowledge or notice that Cajun had not made Oronite an additional insured under Cajun's policies until Oronite unsuccessfully demanded coverage after it was sued by Mr. Dufrene."[42]

The language of Contract Nos. C-1540 and C-1554 requires Cajun to name Oronite as an additional insured and to provide to Oronite evidence of such insurance *before commencing work*.[43] It is undisputed that work commenced on October 16, 1978 for Contract No. C-1540[44] and on February 1, 1979 for Contract No. C-1554.[45] Cajun was required to name Oronite as an additional insured by those dates. "The prescription period begins to run from the time of breach or the time the cause of action arises."[46] If the contracts were breached, the breaches occurred and the causes of action arose either at the time of the execution of the contracts or the dates when work commenced. The prescriptive period for Oronite's breach of contract claim on Contract No. C-1540 began to run on or before October 16, 1978 and the prescriptive period for Oronite's breach of contract claim on Contract No. C-1554 began to run on or before February 1, 1979.

Oronite argues that, even if the prescriptive period on its breach of contract claim ordinarily would begin to run at the time the contracts were executed or the dates the work commenced, the doctrine of *contra non valentum* applies, and the prescriptive

---

[41] R. Doc. 55 at 7.
[42] *Id.* at 8.
[43] R. Doc. 49-4 at 4–5; R. Doc. 49-7 at 6.
[44] R. Doc. 49-4 at 1.
[45] R. Doc. 49-7.
[46] *Richard v. Wal-Mart Stores, Inc.*, 559 F.3d 341, 345 (5th Cir. 2009).

period did not begin to run on either contract until Mr. Dufrene sued Oronite.[47] Oronite argues it "did not have knowledge or notice that Cajun had not made Oronite an additional insured under Cajun's policies until Oronite unsuccessfully demanded coverage after it was sued by Mr. Dufrene."[48]

"*Contra non valentum* halts the running of prescription when the circumstances of the case fall into one of the following four categories: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant."[49]

Oronite contends the fourth category—the "discovery rule"—applies to this case.[50] If the discovery rule applies, prescription runs from the date the plaintiff discovers or should have discovered facts upon which its cause of action is based.[51] "In other words, prescription does not accrue against a party ignorant of its rights provided that ignorance is not willful, negligent or unreasonable."[52] "For the purposes of determining when a

---

[47] R. Doc. 55 at 7–8.
[48] *Id.* at 8.
[49] *Amoco Prod. Co. v. Texaco, Inc.*, 838 So. 2d 821, 829 (La. Ct. App. 3 Cir. 1/29/03) (quoting *Wimberly v. Gatch*, 635 So. 2d 206 (La. 1994)).
[50] R. Doc. 55 at 7–9.
[51] *Amoco*, 838 So. 2d at 830.
[52] *Id.* The principles of *contra non valentum* "do not halt the running of prescription if the plaintiff's ignorance is the result of his own willfulness or neglect." *Id.*

plaintiff knew or should have known of its cause of action, the plaintiff will be deemed to know what it could have learned through reasonable diligence."[53]

According to Oronite, it could not with reasonable diligence have known of Cajun's failure to name it as an additional insured until Oronite was sued by Mr. Dufrene. Under Contract Nos. C-1540 and C-1554, Oronite required that Cajun provide certificates of insurance or other documentary evidence of the insurance Cajun was required to obtain before the work commenced; all insurance documents had to be satisfactory to Oronite.[54] Cajun did, in fact, provide a certificate of insurance to Oronite as part of the bid package for Contract No. C-1540, but the certificate includes no representation that Oronite was an additional insured under any policies.[55]

Oronite had the right under both contracts to require that evidence of insurance be provided and that it "satisfactory to [Oronite]" before work commenced. Clearly, Oronite could have and should have—with reasonable diligence—determined at that time whether Cajun had named Oronite as an additional insured on its insurance policies, as required by the contracts. The Court finds the prescriptive period on Oronite's breach of contract claim began to run either at the time Contract Nos. C-1540 and C-1554 were executed or when work under the contracts commenced. Oronite's argument that it could not have known Cajun failed to name it as an additional insured until it was sued by Mr. Dufrene years after the execution of the contracts is unpersuasive. Oronite, as a

---

[53] *Id.* (citing *Renfroe v. State ex rel. DOTD*, 809 So. 2d 947 (La. 2002)).

[54] Section 6.3 of Contract No. C-1540 provides: "Evidence of Insurance: [Cajun] shall—before commencing the work—provide [Oronite] with certificates or other documentary evidence of the above insurance, satisfactory to [Oronite]." R. Doc. 49-4 at 5. Section 4.2 of Contract No. C-1554 provides the same language. R. Doc. 49-7 at 6.

[55] R. Doc. 49-10 at 30–33. It is unclear whether Cajun provided a certificate of insurance to Oronite for Contract No. C-1554. At oral argument, counsel for Cajun said "I can try to locate the exhibit . . . in the 1554 file, [which is] a signed document by Mr. Barletter saying all insurance has been received." The Court is in receipt of no such document.

sophisticated contracting party, could have and should have engaged in due diligence to protect its own interests. "[T]he focus is on whether a *type* of injury rather than a *particular* injury was discoverable."[56] At the time of execution of the contracts, Oronite was undoubtedly aware of the *type* of injury that could occur—being sued by one of Cajun's employees for damages sustained while performing work under a contract between Oronite and Cajun. With this knowledge, Oronite—acting as a diligent contracting party—could have and should have discovered the breach.

The cases cited by Oronite in support of its position are inapposite. In *Gowan v. Ingram*, the Louisiana Second Circuit Court of Appeal considered when the prescriptive period for a criminal defendant's legal malpractice claim began to run.[57] The plaintiff in *Gowan* sued his attorney for breach of contract, alleging the attorney told Gowan that if he would plead guilty to second degree murder and pay the attorney $10,000, the attorney guaranteed he would not serve more than 15 years in prison on the sentence.[58] Under Louisiana law, however, a conviction of second degree murder carries a mandatory life sentence. The *Gowan* court did not consider whether the doctrine of *contra non valentum* applied, but only considered whether the breach of contract occurred at the time of Gowan's sentencing or once he had served 15 years in prison.[59] The court held that because the action for breach of contract for legal services involved a fixed time for an event to occur (Gowan's release from prison), the running of prescription did not begin until Gowan had been in prison for more than 15 years without being released, as promised by his attorney.[60] Unlike the instant case, the breach of the *Gowan* contract

---

[56] *Via Net v. TIG Ins. Co,* 211 S.W.3d 310, 314 (Tex. 2006) (emphasis in original).
[57] 718 So. 2d 614 (1998).
[58] *Id.* at 616.
[59] *Id.* at 616–17.
[60] *Id.*

occurred 15 years after the execution of the contract. The Court has already determined the breach in this action occurred either upon the execution of the contracts between Oronite and Cajun or upon the commencement of the work.

Oronite also points to *Amoco Production Company v. Texaco, Inc.*, in which the Louisiana Court of Appeal for the Third Circuit found the discovery rule to apply when the plaintiff brought a claim for breach of contract arising out of the cancellation of mineral leases.[61] In *Amoco*, the court found the doctrine of *contra non valentum* applied because the plaintiff could not have reasonably discovered recorded lease cancellations; knowledge of the lease cancellations would have required a "continuous search of the public records," which would "place an unreasonable burden" on the plaintiff.[62] In the instant case, Oronite did not face the same kind of "unreasonable burden" in determining whether it was an additional insured as Amoco faced in determining whether its leases were cancelled. In the instant case, whether Cajun named Oronite as an additional insured on its insurance policies was knowable to Oronite because the contracts required Oronite to be satisfied with the evidence of insurance before work commenced.[63]

Neither the parties nor the Court could locate Louisiana jurisprudence considering a prescription of a breach of contract claim arising out of an insured's responsibility to name another party as an additional insured. However, two non-Louisiana cases are

---

[61] *Amoco*, 838 So. 2d 821.

[62] *Id*. at 831.

[63] Section 6.3 of Contract No. C-1540 provides: "Evidence of Insurance: [Cajun] shall—before commencing the work—provide [Oronite] with certificates or other documentary evidence of the above insurance, satisfactory to [Oronite]." R. Doc. 49-4 at 5. Section 4.2 of Contract No. C-1554 provides the same language. R. Doc. 49-7 at 6.

instructive with respect to when the breach occurred and when the breach was or could have been discovered.[64]

In *Browning v. Boral Bricks, Inc.*, the United States District Court for the Southern District of Mississippi considered a breach of contract claim arising out of an independent contractor agreement between Boral and its contractor, which required the contractor to name Boral as an additional insured on the contractor's insurance policies and to provide Boral with written evidence of the additional insured endorsement.[65] Boral alleged its contractor failed to name it as an additional insured.[66] The court found that "[t]he Agreement plainly requires that [the contractor] obtain insurance coverage, name Boral as an additional insured on the policy, and provide Boral with written evidence of the contract."[67] The Court found "[t]he obligation appears to accrue upon the execution of the contract" and therefore, "Boral's breach of contract claim stemming from [the contractor's] alleged failure to name Boral as an additional insured accrued . . . on the date on which the parties executed the Agreement."[68]

Similarly, in *Via Net, U.S. v. TIG Insurance Co.*, the Supreme Court of Texas considered whether the "discovery rule" applied to a breach of contract action brought by a manufacturer, Safety Lights, against one of its vendors, Via Net, for Via Net's failure to name Safety Lights as an additional insured on its insurance policies.[69] Much like the instant case, Via Net was required under its contract with Safety Lights to name Safety

---

[64] The Southern District of Mississippi in *Browning* applied Mississippi law, and the Supreme Court of Texas in *Via Net* applied Texas law. Both Mississippi and Texas law provide the same as Louisiana law—a breach of contract claim accrues at the time of the breach.
[65] No. 11-168, 2012 WL 1231884 (S.D. Miss. Apr. 11, 2012).
[66] *Id.* at *3.
[67] *Id.*
[68] *Id.*
[69] *Via Net*, 211 S.W.3d 310 (Tex. 2006).

Lights as an additional insured on its commercial general liability policies. The Supreme Court of Texas held the discovery rule did not apply to Safety Lights' breach of contract claim, reasoning Safety Lights could have—with reasonable diligence—discovered within the limitations period that Via Net failed to name it as an additional insured.[70] According to the *Via Net* court, the failure to add a third party as an additional insured was not "inherently undiscoverable" because it could have been discovered within the prescribed limitations period with due diligence.[71] The court stated that due diligence of contracting parties "requires that each protect its own interests," which may include "asking a contract partner for information needed to verify contractual performance."[72] Finding that Safety Lights' "fail[ure] to even ask for such information [showing its status as an additional insured] [was] not due diligence," the *Via Net* court held the discovery rule did not defer the accrual of Safety Lights' breach of contract claim.[73]

The doctrine of *contra non valentum* does not apply to Oronite's breach of contract claim because the cause of action was reasonably knowable by Oronite at the time of the execution of the contracts or when the work commenced. Cajun is granted summary judgment that Oronite's breach of contract claim has prescribed.

II.    **<u>Oronite's Tender to Cajun Established Potential Liability</u>**

Before considering whether the indemnity provisions in the contracts are applicable, the Court must first determine whether Oronite was required to establish actual or potential liability to Mr. Dufrene when it tendered its demand for indemnification.

---

[70] *Id.* at 314–15.
[71] *Id.* at 313.
[72] *Id.* at 314.
[73] *Id.* at 314–15.

As a general rule, an indemnitee such as Oronite must establish actual liability and the reasonableness of its settlement to recover from the indemnitor.[74] But an indemnitee need only establish potential liability in certain situations.[75] The Fifth Circuit has provided:

> "[An indemnitee] need only show potential (rather than actual) liability to recover indemnity where either (1) the defendant tenders the defense of the action to the indemnitor; (2) the claim for indemnity is founded upon a judgment; [or] (3) the defendant's claim is based on a written contract of insurance or indemnification."[76]

The requirement to show actual liability "does not apply in situations where the indemnitor was tendered the defense and refused it, or where the indemnitee's claim against the indemnitor is based on a written contract. Then potential liability need be shown."[77] Oronite only had to establish it had potential liability when it tendered its demand for indemnity.

Neither party contends Oronite is not potentially liable for Mr. Dufrene's negligence claims under Contract No. C-1540. The question is whether Oronite is potentially liable to Mr. Dufrene for his strict liability claim, possibly entitling Oronite to indemnity under Contract No. C-1554.

---

[74] *Terra Resources v. Lake Charles Dredging & Towing*, 695 F.2d 828, 831 (5th Cir. 1983); *Gaspard v. Offshore Crane & Equip., Inc.*, No. 94-261, 1998 WL 388597, *9 (E.D. La. July 8, 1998) ("When an indemnitee settles with a plaintiff, without giving the indemnitor notice and an opportunity to take over the defense and/or acquiesce in the settlement, then the indemnitee must establish its actual liability and that the settlement was reasonable.").

[75] The court in *Gilbert v. Offshore Prod. & Salvage, Inc.* that "once an indemnitee shows that it is potentially liable, the burden shifts to the indemnitor to show that the settlement is unreasonable." No. 95-122, 1997 WL 149959, *12 (E.D. La. Mar. 21, 1997) (citing *Wisconsin Barge Line, Inc. v. Barge Chem 300*, 546 F.2d 1125, 1129–30 (5th Cir. 1977)). As discussed below, the Court finds Oronite has established that it was potentially liable under both contracts. The burden then shifts to Cajun to show Oronite's settlement with Mr. Dufrene was unreasonable. Cajun submits no summary-judgment evidence to that effect.

[76] *Bourg v. Chevron U.S.A., Inc.*, 91 F.3d 141 (5th Cir. 1996).

[77] *Gaspard*, 1998 WL 388597 at *9. *See also Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 304 (5th Cir. 1973).

Cajun contends that Oronite cannot show it has potential liability without fault.[78] To establish strict liability under Article 2317, a plaintiff must show that: "(1) the thing which caused the damage was in the care, custody and control of the defendant; (2) the thing had a vice or defect which created an unreasonable risk of harm; and (3) the injuries were caused by this defect."[79]

In support of its argument that Oronite has no potential liability for Mr. Dufrene's injuries, Cajun points to *Smith v. Union Carbide Corp.*, in which the court granted summary judgment as to the plaintiff's strict liability claims.[80] The *Smith* plaintiff was exposed to asbestos while he was installing new insulation on the defendants' premises.[81] The premises-owner defendants argued they did not have control or custody of the products containing asbestos until after it was installed and put into service at their facilities, and thus could not be strictly liable.[82] Because the plaintiff did not point to evidence sufficient to show that the defendants had custody of the asbestos while it was being installed, the court found the defendants were not strictly liable under article 2317.[83]

*Smith*, however, is distinguishable from the instant case. Unlike the *Smith* plaintiff, Mr. Dufrene was not installing asbestos-laden insulation under Contract No. C-1554. Instead, Mr. Dufrene was exposed to asbestos that was already existing on Oronite's premises when he removed the old insulation, as directed by Contract No. C-1554. Thus, *Smith* is not applicable to the facts of this case.

---

[78] R. Doc. 66 at 18.
[79] *Migilori v. Willows Apartments*, 727 So. 2d 1258, 1260 (La. Ct. App. 4 Cir. 2/3/99).
[80] No. 13-6323, 2014 WL 4930457 (E.D. La. Oct. 1, 2014).
[81] *Id.* at *6.
[82] *Id.*
[83] *Id.*

Cajun's contention that Oronite has no potential strict premises liability is contrary to Louisiana caselaw. There is no blanket rule under Louisiana law that a premises defendant can never be found to have custody or control of asbestos dust, thus precluding a finding of strict liability. Such an inquiry is fact-specific. For instance, in *Watts v. Georgia Pacific Corp.*, the Louisiana First Circuit Court of Appeal affirmed a jury's finding that Dow was strictly liable as a premises owner.[84] The court found "a reasonable factual basis exist[ed] to support the trial court's implicit finding that Dow [was] liable based on a theory of strict custodial liability under [Louisiana Civil Code article] 2317" because "Dow owned the asbestos, which was unreasonably dangerous, and the inhalation occurred on Dow's premises; and Dow failed to take reasonable steps to prevent his injury."[85]

Mr. Dufrene sued Oronite for strict liability under both Articles 2317 and 2322. Had Mr. Dufrene's case against Oronite gone to trial, there undoubtedly would have been testimony and evidence with respect to (1) whether Oronite was in control of the asbestos because it was found in old insulation installed on its premises, (2) whether the old insulation containing asbestos was unreasonably dangerous, (3) whether Oronite failed to take reasonable steps to prevent Mr. Dufrene's injuries, and (4) whether such failure was the cause—at least in part—of Mr. Dufrene's injuries. It is possible the jury could have found Oronite liable based on a theory of strict custodial liability. The Court finds Oronite has demonstrated it was potentially liable to Mr. Dufrene for strict premises liability.

---

[84] 135 So. 3d 53, 61–62 (La. Ct. App. 1 Cir. 9/16/13).
[85] *Id.*

Cajun also contends Oronite is not entitled to summary judgment for indemnity under either contract because its tender to Cajun was insufficient as it did not tender any particular settlement offer or amount in its letter, thus precluding Cajun from evaluating the reasonableness of Oronite's settlement payment.[86] According to Cajun, because Oronite's tender is insufficient, Oronite must prove its actual liability to Mr. Dufrene.[87]

The Court in *Morris v. Schlumberger, Ltd.* stated:

> There is no rigid requirement that the indemnitee offer [the] . . . precise choice to the indemnitor [of approving of the settlement or taking over the indemnitee's defense]. The primary concern is fairness to the indemnitor. . . . A formal tender of defense is not required, rather only an opportunity to defend is necessary.[88]

Oronite's April 20, 2015 demand letter to Cajun requested that Cajun "defend, protect, indemnify and hold Chevron Oronite Company LLC harmless" with respect to Mr. Dufrene's lawsuit.[89] Oronite attached to the letter Mr. Dufrene's petition for damages, Mr. Dufrene's depositions, and Contract Nos. C-1540 and C-1554.[90] Cajun then quoted the indemnity provisions in both contracts.[91] Finally, the letter stated "If Cajun does not immediately acknowledge its responsibility to defend and indemnify Chevron Oronite with respect to these claims, Chevron Oronite may settle the case and proceed against Cajun for all costs of defense and settlement."[92] Oronite's April 20, 2015 demand letter to Cajun provided Cajun sufficient notice and an opportunity to defend, which is all that is required.[93]

---

[86] R. Doc. 57 at 5.
[87] R. Doc. 57 at 4–6.
[88] *Morris v. Schlumberger, Ltd.*, 445 So. 2d 1242, 1246 (La. Ct. App. 3 Cir. 2/1/84), *writ denied* (La. 4/23/84).
[89] R. Doc. 13-16.
[90] *Id.*
[91] *Id.*
[92] *Id.* at 3.
[93] *See Morris*, 445 So. 2d at 1246 ("If the indemnitor refuses to take either course, then the indemnitee will only be required to show potential liability to the original plaintiff to support his claim for indemnity.").

The Court will now consider whether Oronite is entitled to indemnity from Cajun under Contract Nos. C-1540 and C-1554.

III.    **Oronite is Entitled to Indemnity under Contract No. C-1540**

Oronite seeks summary judgment that it is owed indemnity by Cajun for its payments to Mr. Dufrene for injuries he sustained while performing work under Contract No. C-1540.[94] Cajun seeks summary judgment that it owes no indemnity under Contract No. C-1540, arguing Mr. Dufrene was not exposed to asbestos during his work under Contract No. C-1540 because Contract No. C-1540 applied only to work installing new insulation, which did not contain asbestos.[95]

The indemnity language of Contract No. C-1540 provides:

> [Cajun] shall indemnify and save harmless the indemnitees from and against any and all loss, damage, injury, liability, and claims thereof for injury to or death of a person, including an employee of [Cajun] or an indemnitee . . . resulting directly or indirectly from [Cajun's] performance of this Agreement . . . regardless of the negligence of, and regardless of whether liability without fault is imposed or sought to be imposed on, one or more of the indemnitees, except to the extent that such indemnity is void or otherwise unenforceable under the applicable law in effect on or validly retroactive to the date of this Agreement and except where such loss, damage, injury, liability or claim is the result of active negligence or willful misconduct of an indemnitee and is not contributed to by any act of, or by any omission to perform some duty imposed by law or contract on, [Cajun], its subcontractor or either's agent or employee.[96]

First, for the indemnity provision to be triggered, Mr. Dufrene's claim must have "result[ed] directly or indirectly from [Cajun's] performance of this Agreement."[97] Cajun contends Oronite's claim for indemnity fails at this threshold because Mr. Dufrene was not exposed to asbestos while working under Contract No. C-1540.[98]

---

[94] R. Doc. 13.
[95] R. Doc. 49-1 at 16–19.
[96] R. Doc. 49-4 at 4.
[97] R. Doc. 49-4 at 4.
[98] R. Doc. 49-1 at 13–19.

Contract No. C-1540, executed on February 1, 1979, required Cajun to perform "installation of insulation in [the] wiped film evaporator."[99] It is undisputed that on October 11, 1972, Chevron adopted a policy of "specifying 100% calcium silicate no asbestos" on "new insulation."[100] It is further undisputed that the insulation being installed under Contract No. C-1540 was "new insulation," which did not contain asbestos.[101]

According to Cajun, the Court's inquiry should stop here; because Contract No. C-1540 was for installation of new insulation, which did not contain asbestos, it is impossible for Mr. Dufrene to have been exposed to asbestos while performing work under Contract No. C-1540.[102] As a result, Cajun argues, Mr. Dufrene's injuries could not "result[] directly or indirectly from [Cajun's] performance under" Contract No. C-1540.[103]

Unfortunately for Cajun, Oronite has produced uncontroverted evidence that Mr. Dufrene, while working under Contract No. C-1540, also removed old insulation, which contained asbestos. Mr. Dufrene testified that when he was working at the Oronite facility on a "specific contract job . . . that required the installation of new insulation," which the parties do not dispute was work performed pursuant to Contract No. C-1540,[104] he would

---

[99] R. Doc. 49-4 at 1.

[100] R. Doc. 49-3 at 2, R. Doc. 55-1 at 1, R. Doc. 49-5.

[101] R. Doc. 49-3 at 4, R. Doc. 55-1 at 7, R. Doc. 49-5, R. Doc. 49-12 at 8–9.

[102] *See* R. Doc. 66 at 14–15. Cajun argues Oronite cannot be potentially liable to Mr. Dufrene under Contract No. C-1540 because he was not substantially exposed to asbestos. R. Doc. 66 at 15. Although Cajun correctly states the current Louisiana caselaw that requires a claimant in an asbestos case to prove at trial that he had significant exposure, *see Vedros v. Northrop Grumman Shipbuilding, Inc.*, 119 F. Supp. 3d 556 (E.D. La. Aug. 4, 2015), the issue in this case is *potential* liability in the context of a claim for indemnification. The question of what exposure is sufficient to recover at trial is not cut and dry, and instead requires a litany of evidence and expert testimony. There is no evidence before the Court that Mr. Dufrene's exposure was so unsubstantial that there is no potential liability on the part of Oronite. To require Oronite to prove Mr. Dufrene was substantially exposed to asbestos would essentially require it to prove actual liability, which it is not required to do. In any event, removing even small amounts of asbestos from a pipe at close range without wearing a respirator would certainly entail substantially more than background exposure.

[103] R. Doc. 49-1 at 13–14; R. Doc. 49-4 at 4.

[104] R. Doc. 49-3 at 4, R. Doc. 55-1 at 7, R. Doc. 49-5, R. Doc. 49-12 at 8–9.

often have to remove old insulation when he reached a "tie-in" point.[105] Mr. Dufrene's

testified the following at his deposition:

> Q: So just focusing on the specific contract jobs, did they require the removal of old insulation or was it just new insulation installation?
>
> A: It would have been some . . . removal . . . where it got to the point where it was a tie in because new piping . . . added to it.
>
> ***
>
> Q: And you have to put the new insulation on the new pipe, but in order to do that you have to meet the old insulation that was on the old pipe . . . and extend it? And in order to do a tie in, you may have to remove insulation but you only have to remove enough to make the tie in, correct?
>
> A: Correct.[106]

Mr. Dufrene further testified that, when working on contracts to install new insulation,

he would often have to "uninsulate to insulate."[107] When asked whether "there [was]

somebody at Cajun who was tasked with removing the old insulation and somebody else

who was tasked with putting on the new insulation or [whether] that was the same

person," Mr. Dufrene responded "[s]ame person."[108]

Blaine Fury, Oronite's corporate representative, also testified that, even though

work under Contract No. C-1540 was to install new insulation, workers had potential

exposure to asbestos when tying into existing equipment.[109] The engineering

specifications for Contract No. C-1540 instructed Cajun to submit daily time sheets for

"insulating piping at T-295, P-949 and *tie-in piping in pipe racks*."[110]

---

[105] R. Doc. 13-12 at 13.
[106] R. Doc. 13-12 at 13.
[107] R. Doc. 13-11 at 29.
[108] R. Doc. 13-12 at 13.
[109] R. Doc. 55-8 at 4–6 ("[T]he tie-in to the existing equipment would . . . potentially expose [a worker] to whatever insulation material was there at the time.").
[110] R. Doc. 55-9.

At oral argument, Cajun suggested that any time Mr. Dufrene would reach a "tie in" and thus need to remove old insulation he would no longer be working under Contract No. C-1540, but instead would switch to a maintenance contract, such as Contract No. C-1554, the purpose of which was to remove old asbestos. Mr. Dufrene's work sheets demonstrate this was not the case.[111] Each day Mr. Dufrene worked at the Oronite facility, his time was recorded under only one contract.[112] Mr. Dufrene worked 10 days under Contract C-1540 and 58 days under Contract No. C-1554.[113] There are no days for which his time is recorded under both contracts.[114] There is no evidence that, when Mr. Dufrene reached a tie in to existing equipment while working under Contract C-1540, he would switch to working under Contract No. C-1554, and then switch back to working under Contract No. C-1540 once the tie in was complete.

Cajun offers no summary judgment evidence to demonstrate that a disputed issue of fact exists with respect to whether Mr. Dufrene removed old insulation containing asbestos under Contract No. C-1540 when he needed to perform a tie-in to existing equipment. As a result, Mr. Dufrene was exposed to asbestos while working under Contract No. C-1540 and his claim for damages "result[ed] directly or indirectly from [Cajun's] performance" under that contract.[115]

Second, Cajun argues it is not required to indemnify Oronite because Mr. Dufrene alleged his injuries were the result of Oronite's "active negligence or willful

---

[111] R. Doc. 75-5.
[112] *See* R. Doc. 75-5.
[113] *See id.*
[114] *See id.*
[115] R. Doc. 49-4 at 4.

misconduct."[116] Section 5.1 of Contract No. C-1540 provides that Cajun will indemnify Oronite:

> [R]egardless of the negligence of, and regardless of whether liability without fault is imposed or sought to be imposed on, one or more of the indemnitees, . . . except where such loss, damage, injury, liability or claim is the result of active negligence or willful misconduct of an indemnitee and is not contributed to by any act of, or by any omission to perform some duty imposed by law or contract on, [Cajun], its subcontractor or either's agent or employee.[117]

The undisputed terms of the indemnity provision provide that Cajun must indemnify Oronite "regardless of the negligence of" Oronite,[118] but Oronite has no right to indemnity where the injury sustained was the result of Oronite's "active negligence or willful misconduct"[119] and the injury sustained "is contributed to by any act of, or by any omission to perform some duty imposed by law or contract on, [Cajun]."[120] The Court must determine whether this exception applies.

For the purposes of this analysis, the Court will give the benefit of the doubt to Cajun and assume that Mr. Dufrene's injuries arose—at least in part—as a result of Oronite's "active negligence or willful misconduct" as alleged by Mr. Dufrene. Mr. Dufrene sued Oronite for "strict premises liability and negligence," and alleged Oronite "negligently, recklessly, willfully and/or because of gross and wanton negligence, fault, or strict liability, failed to properly discharge its duties to [Mr. Dufrene]."[121] Based on this assumption, Cajun would be relieved of its obligation to indemnify Oronite unless it is

---

[116] R. Doc. 57 at 13.
[117] R. Doc. 49-4 at 4.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] R. Doc. 49-9 at 10.

shown that Cajun contributed to Mr. Dufrene's claim for damages through an act or omission to perform some duty imposed by law or contract.

Oronite contends Cajun contributed to Mr. Dufrene's claim through an act or omission to perform some duty imposed by law because Cajun by failed to comply with OSHA asbestos standards. In support, Oronite points to Mr. Dufrene's deposition, in which he testified he performed work at the Oronite facility in 1978–1979, but that it was not until the very end of his employment with Cajun—in 1982 or 1983—that "procedures changed and safety precautions were put in place with respect to asbestos exposure."[122] Mr. Dufrene further testified that "Cajun [never] informed [him] prior to 1982 about the hazards of asbestos"[123] and during his time working for Cajun, there was no one "thought of as a safety man or having responsibility for safety of the Cajun employees."[124] Neither did Mr. Dufrene, during the entire time he was employed with Cajun, attend any "meeting with Cajun personnel to discuss OSHA."[125]

Oronite also presents the expert report of Michael Hentgen, its industrial hygienist, in which Mr. Hentgen states his opinion that "[c]ompliance with the OSHA asbestos standard in the 1978 and 1983 time period required employers to sequentially address the Asbestos standard's requirements,"[126] such as the requirement that Cajun "provide workers, such as Mr. Dufrene, engaged in the removal of asbestos containing materials, with a respirator."[127] Mr. Hentgen further opined that "Cajun Insulation did

---

[122] R. Doc. 13-11 at 37.

[123] R. Doc. 13-11 at 29; *see also id.* at 38 ("Q: Would I be correct that prior to the time that these safety measures were begun at Cajun in '82 and '83, no one at Cajun ever warned you that there was a health hazard associated with exposure to asbestos? A: No, sir."); *id.* at 39 (same).

[124] R. Doc. 13-11 at 40.

[125] R. Doc. 13-12 at 9.

[126] R. Doc. 55-13 at 8.

[127] *Id.*

not have a respiratory program, required by OSHA when Mr. Dufrene worked at Chevron."[128] Cajun's own expert—Laurence Durio—agreed with this statement.[129] Mr. Hentgen also stated he had not "reviewed any evidence associated with this case indicating that Cajun Insulation made any legitimate attempt to comply with the OSHA asbestos standard at Chevron Oronite's Oak Grove facility for the period of time covering Mr. Dufrene's work."[130]

Oronite also provided the deposition testimony of Richard Lemen, one of Mr. Dufrene's experts in the underlying suit, in which Mr. Lemen testified that OSHA required workers to be supplied "personal protective equipment such as respirators" when the worker would be exposed to a personal exposure level "that exceeded 2 fibers per cc as an 8-hour time-weighted average."[131] Mr. Lemen also testified "it was possible that [Mr. Dufrene] did have exposures above the OSHA 2 fiber cc time-weighted average," and therefore he should have been provided with personal protection equipment, such as respiratory protection.[132] Further, Mr. Lemen testified that he "did not see any evidence that [Mr. Dufrene] was given any [respirator], wore any [respirator] or requested any [respirator]."[133]

Oronite, as the movant on summary judgment, has met its burden of bringing forth "evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted

---

[128] R. Doc. 55-13 at 12.
[129] Deposition of Laurence Durio, pp. 36–37. Attached as Exhibit A.
[130] R. Doc. 55-13 at 12.
[131] R. Doc. 13-15 at 7.
[132] *Id.* at 10.
[133] R. Doc. 13-15 at 8.

at trial.'"[134] Thus the burden shifts to Cajun to point to summary-judgment evidence to create a genuine dispute of material fact.

In an attempt to meet its burden to show that there is a genuine dispute of material fact, Cajun submits the deposition testimony of its president, Edward Duhe, who testified Cajun complied with OSHA regulations because it "put together" a handbook on respiratory protection.[135] When asked whether Cajun implemented policies to protect its employees from asbestos exposure in 1978, Mr. Duhe responded Cajun "tried to" and that it "more or less followed [the] handbook."[136] It is evident from Mr. Dufrene's testimony that, even if Cajun made some effort to follow OSHA requirements, it did not succeed. Cajun's handbook required, among other things, that Cajun provide its employees "with a clean area to change from street clothes to safety equipment" and instructed employees to "go to the change room, clean self and dress in street clothes."[137] Mr. Dufrene testified Cajun did not supply its employees with showers or changes of clothes at any of its job sites.[138] Mr. Dufrene also testified that Cajun did not begin to follow other safety procedures required by the handbook, such as the bagging of old insulation, until 1982 or 1983.[139]

---

[134] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).

[135] R. Doc. 57-5 at 4.

[136] R. Doc. 57-5 at 5.

[137] R. Doc. 57-6 at 2.

[138] R. Doc. 13-12 at 8 ("Q: Did Cajun supply you-all [sic] with showers at any of these job sites? A: No, sir. Q: Did you have a changes of cloths [sic] for any of these job sites? A: No, sir.").

[139] R. Doc. 13-12 at 9. ("Q: Do you remember about what month or year that Shell job was? . . . A: I would have actually went from '82 to '83. Q: And that was the first, and you told us about the different removal procedures that were in place with the bagging of old insulation . . . and wearing the clothes and everything. That was the first and only time when you worked at Cajun that you followed those procedures; is that correct? A: Yes, sir.").

Further, Cajun's expert, Laurence Durio, stated the date of Cajun's handbook was March of 1979.[140] Even if the Court accepts as true Mr. Duhe's testimony that Cajun more or less followed its handbook starting in March of 1979, this does not create a genuine issue of fact as to whether Cajun failed to perform a duty imposed by law or contract before that time. It is undisputed that Mr. Dufrene's work under Contract No. C-1540 began no later than February 11, 1979.[141] From February 11, 1979 until some time in March 1979, there was no handbook relating to regulatory protection in effect and no summary-judgment evidence that Cajun was complying with OSHA regulations.

Even if the handbook had been in place the entire time period Mr. Dufrene performed work under C-1540, Cajun's own expert testified the handbook did not set forth all of the requirements of OSHA for respiratory protection, and the handbook itself was not—"as a standalone"—sufficient under the OSHA regulations.[142] Cajun does not produce any other handbook or policies in effect before March of 1979. Cajun offers no summary judgment evidence to refute the testimony that Cajun was not complying with its obligations under law for at least part of the time Mr. Dufrene worked at Oronite under Contract No. C-1540.[143]

Oronite's motion for summary judgment is granted. It is entitled to indemnity under Contract No. C-1540.

---

[140] R. Doc. 57-3 at 2.

[141] R. Doc. 49-3 at 3; R. Doc. 49-8.

[142] R. Doc. 62-5 at 8-9.

[143] The Court also notes that Cajun had a duty imposed by contract that may have contributed to Mr. Dufrene's claim for damages. Section 5.4 of Contract No. C-1540 provides: "[Cajun] shall comply with all laws, regulations, decrees, codes, ordinances, resolutions, and other acts of any governmental authority, . . . which are applicable to this Agreement and [Cajun's] performance hereunder . . . ." R. Doc. 49-4 at 4. Thus, any failure of Cajun to comply with the requirements of OSHA are a breach of a duty imposed by contract.

IV. **Oronite is Owed Indemnity under Contract No. C-1554**

Oronite seeks summary judgment that it is entitled to indemnity from Cajun for its payments to Mr. Dufrene for injuries he sustained while performing work under Contract No. C-1554.[144] Unlike Contract No. C-1540, it is undisputed that Mr. Dufrene was exposed to asbestos while performing work under Contract No. C-1554 because that contract was for the removal of old insulation, which both parties agree contained asbestos.[145]

Cajun seeks summary judgment that it owes no indemnity under Contract No. C-1554, arguing the indemnity language of Contract No. C-1554 precludes Oronite from seeking indemnity for its own negligence.[146] Oronite agrees it is not entitled to indemnity for its own negligence,[147] but contends it is entitled to indemnification because Mr. Dufrene's claim was also based on strict liability.[148]

The indemnity language of Contract No. C-1554 provides:

3.2 [Cajun] agrees to defend and hold [Chevron], its assigns, directors, employees, insurers, officers, stockholders and successors indemnified and harmless from and against any loss, expense, claim or demand for:

> 3.21 Injury to or death of [Cajun's] employees or for damage to or loss of [Cajun's] property in any way arising out of or connected with the performance by [Cajun] of services hereunder.[149]

---

[144] R. Doc. 13.

[145] R. Doc. 49-3 at 4; R. Doc. 55-1 at 7.

[146] R. Doc. 49.

[147] Interpreting an indemnity agreement identical to that found in Contract No. C-1554, the Fifth Circuit in *Smith v. Chevron Oil Co.* found that the indemnity provision "does not provide for indemnification for [Chevron's] own negligence in the clear and specific language required by Louisiana law." 517 F.2d 1154, 1157 (5th Cir. 1975). "Without the requisite clear language for [the contractor] to indemnify Chevron for the injury damages, in view of Chevron's negligence, there is no contract language to indicate an intent for [the contractor] to provide a legal defense for Chevron against its negligent acts." *Id.* at 1158.

[148] R. Doc. R. Doc. 55 at 16.

[149] R. Doc. 49-7 at 4–5.

Oronite does not seek indemnity under Contract No. C-1554 for its negligence, but argues it is entitled to indemnity for the strict liability claim asserted against it by Mr. Dufrene.[150]

In *Branch v. Fidelity & Casualty Co. of New York*, the Fifth Circuit considered the exact indemnity language found in Contract No. C-1554.[151] The court found that the law in the Fifth Circuit "establish[es] beyond peradventure the scope, reach, and limitations of this indemnity agreement."[152] The court held this indemnity agreement "does not insulate Chevron from the effects or consequences of its own negligence," but "the indemnity agreement [does] cover claims against Chevron based on its responsibilities under Louisiana's strict liability regimes."[153] Thus, the Court stated "[t]o the extent Chevron seeks indemnification for claims based on allegations of its negligence, its demands are rejected," but "[t]o the extent Chevron demands that [the contractor] pay the claims of the complainants based on allegations and proof of its strict liability, those demands . . . [are] appropriate."[154]

Under Louisiana law, when the indemnitee's liability is based upon strict liability, the rule of strict construction that applies to liability based on negligence requiring that intent to be expressed in unequivocal terms does not apply.[155] Instead, a court must:

---

[150] R. Doc. 55 at 16.
[151] 783 F.2d 1289, 1294 (5th Cir. 1986).
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Fontenot v. Town of Mamou*, 676 So. 2d 677, 679 (La. Ct. App. 3 Cir. 6/5/1996) (citing *Soverign Ins. Co. v. Tex. Pipe Line Co.*, 488 So. 2d 982 (La. 1986)) ("The supreme court has decided that a contract of indemnity whereby the indemnitee is indemnified against the consequences of its own negligence is strictly construed, and that such a contract will be presumed not to indemnify an indemnitee against losses resulting to it through its own negligent acts unless such an intention is expressed in unequivocal terms. The supreme court has also decided that a slightly different standard governs when the indemnitee's liability is based upon strict liability under [Louisiana Civil Code article] 2317.").

(1) determine the common intent of the parties as to strict liability by applying the general rules of construction and interpreting each provision in light of the contract as a whole; and

(2) if the parties' common intent as to strict liability remains in doubt, we must construe the contract further in light of everything that by law, custom, usage, or equity is considered incidental to the particular contract or necessary to carry it into effect.[156]

Cajun argues "[i]t would be nonsensical and reach an absurd result to hold that Chevron is not entitled to indemnity for Chevron's negligence, yet award indemnity for settlement payments made by Chevron based on strict liability."[157] The Fifth Circuit in *Hyde v. Chevron U.S.A., Inc.*, rejected this argument, finding that "the basis for the general rule of not allowing a party to contract against [its] own negligence is not applicable to strict liability cases in which the owner-custodian may be non-negligent, non-culpable, and even reasonable and careful in his conduct towards others."[158]

Based on *Branch*, the Court finds the contract provides indemnity for Mr. Dufrene's claims based on strict liability. As a result, Oronite's motion for summary judgment is granted. It is entitled to indemnity from Cajun under Contract No. C-1544.

V.    **Attorneys' Fees and Costs**

The Court has granted Oronite's motion for summary judgment with respect to indemnity under both contracts.

Section 5.7 of Contract No. C-1540 provides[159]:

"[Cajun] shall promptly pay (a) to any indemnitee all costs and attorneys' fees incurred by such indemnitee resulting directly or indirectly from any and all loss, damage, injury, liability and claims for which [Cajun] is obligated to indemnify such indemnitee . . . , and (b) to [Oronite] all costs

---

[156] *Id.* (citing *Soverign*, 488 So. 2d at 985).
[157] R. Doc. 85 at 4.
[158] 697 F.2d 614, 632 (5th Cir. 1983).
[159] Contract No. C-1554 has no provision for attorneys' fees or costs. *See* R. Doc. 13-5. Oronite agrees that Contract C-1554 does not require Cajun to pay its attorney fees and expenses in this action, even though Oronite is entitled to indemnity under Contract No. C-1554. R. Doc. 55 at 19.

and reasonable attorneys' fees in any legal action in which [Oronite] or its affiliate prevails, in whole or in part, brought against [Cajun] based on a breach of this Agreement."[160]

It is undisputed that Oronite incurred attorneys' fees and costs in connection with the defense of Mr. Dufrene's suit,[161] as well as in connection with Oronite's prosecution of its claims against Cajun for breach of Contract No. C-1540.[162] The Court finds that, pursuant to Section 5.7 of Contract No. C-1540, Oronite is entitled to attorneys' fees and costs for its defense of the claim filed by Mr. Dufrene and for its prosecution of this action.[163]

## CONCLUSION

**IT IS ORDERED** that Cajun's motion for summary judgment[164] with respect to Oronite's breach of contract claim is **GRANTED** and Oronite's motion for summary judgment[165] with respect to its breach of contract claim is **DENIED**. Oronite's breach of contract claim against Cajun is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Oronite's motion for summary judgment[166] that it is entitled to indemnity under Contract Nos. C-1540 and C-1554 is **GRANTED**.

**IT IS FURTHER ORDERED** that Oronite's motion for summary judgment that it is entitled to attorneys' fees and costs incurred in its defense of the claim filed by Mr. Dufrene and in prosecuting this action under Contract No. C-1540 is **GRANTED**.

---

[160] R. Doc. 13-4 at 13.
[161] R. Doc. 13-2 at 5–6; R. Doc. 57-7 at 4; R. Doc. 13-4.
[162] R. Doc. 13-2 at 6; R. Doc. 57-7 at 4; R. Doc. 13-4.
[163] The attorneys' fees and costs are not susceptible to allocation under Contract Nos. C-1540 and C-1554.
[164] R. Doc. 49.
[165] R. Doc. 13.
[166] R. Doc. 13. Cajun's motion for summary judgment with respect to Oronite's claims for indemnity under Contract Nos. C-1540 and C-1554 is denied. R. Doc. 49.

**IT IS FURTHER ORDERED** that the motion be referred to the United States Magistrate Judge for determination of the amount of attorneys' fees and costs to be awarded.

**IT IS FURTHER ORDERED** that any motion for interest on amounts awarded must be filed by August 16, 2017. Cajun may file an opposition to the motion on or before August 21, 2017.

**IT IS FURTHER ORDERED** that the motion in limine to exclude the expert testimony of Michael Hentgen[167] filed by Cajun is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the motion in limine to exclude evidence at trial[168] filed by Cajun is **DENIED AS MOOT**.

**New Orleans, Louisiana, this 10th day of August, 2017.**

_Susie Morgan_
_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[167] R. Doc. 50.
[168] R. Doc. 89.